ROSEMARY DUPREE, Special Adm'r on Behalf of the Estate of Christopher Hunter, Deceased, Plaintiff-Appellant, v. THE COUNTY OF COOK, Defendant-Appellee.

First District (4th Division)   No. 1—95—1652

Opinion filed February 27, 1997.

136

Gordon & Gordon, of Chicago (Robert E. Gordon and Lisa Thaviu, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Patricia Shymanski,

Richard A. Stevens, Judith Mondello Wick, and Christine DeGraff Dawson, of counsel), for appellee.

JUSTICE CERDA delivered the opinion of the court:

This is a medical malpractice case in which plaintiff, Rosemary Dupree, special administrator of the estate of Christopher Hunter, alleged that a proximate cause of Christopher's death was the failure of defendant, Cook County, to correctly diagnose that he was physically abused by his mother, Mildred Hunter, and to report that abuse. Plaintiff's fourth amended complaint alleged that defendant: (1) carelessly and negligently failed to properly interpret a CT scan; (2) carelessly and negligently allowed a resident to interpret a CT scan without being reviewed by the attending radiologist and attending physician; (3) carelessly and negligently discharged Christopher without a proper evaluation of the CT scan; and (4) carelessly and negligently discharged Christopher to his mother's care without notifying the Department of Children and Family Services (DCFS) of a fractured skull and subdural hematomas.

Following a jury verdict in favor of defendant, plaintiff appealed. On appeal, plaintiff asserts that the trial court erred in not striking the expert testimony of Dr. Byrd, whose opinions were not based on evidence, and abused its discretion (1) in denying her motion for a mistrial based on defense counsel's repeated violation of *in limine* orders and other misconduct; (2) in denying her motion for a new trial based on the same misconduct by defense counsel; (3) in barring her expert witness, Dr. Liza Squires, as a Supreme Court Rule 220 sanction (134 Ill. 2d R. 220); and (4) in denying her motion for a new trial since the jury verdict was contrary to the manifest weight of the evidence. For the following reasons, we affirm.

Christopher was born on December 29, 1986. On March 2, 1987, he was admitted to Cook County Hospital, where he underwent a CT scan of his brain. Defendant misread the March 6, 1987, CT scan as normal and failed to diagnose the bilateral subdural hematoma and skull fracture that were present. DCFS was not notified, and on March 9, 1987, Christopher was discharged to his mother, who was instructed to bring him to the High Risk Clinic for a follow-up visit at 12:30 p.m. on March 16, 1987. She failed to do so, and on July 3, 1987, Christopher was admitted to Cook County Hospital, where he was diagnosed with hydrocephalus, commonly known as water on the brain. The attending pediatrics physician, Dr. Demetra Soter, viewed Christopher's March 6 CT scan and determined that it was abnormal. It showed a bilateral subdural hematoma and a skull fracture. After Christopher was discharged from the hospital in July 1987, he was placed in foster care and died on May 16, 1988.

Following opening statements, plaintiff moved for a mistrial based on defendant's statements that plaintiff's expert witness, Dr. Marshall Salkin, was paid to review cases and that Mildred Hunter shook Christopher in anger for 15 minutes. The motion was denied.

Dr. Demetra Soter, a child abuse expert, testified as an adverse witness. She stated that she was one of the pediatricians who treated Christopher when he was admitted to the hospital's pediatric intensive care unit on July 3, 1987, in critical condition. At that time, Christopher was skinny and very, very small, and his head was the size of a small watermelon. He was blind, deaf, and severely brain-damaged. He could not turn his head, roll over, or sit up. After she diagnosed Christopher with hydrocephalus, a shunt was immediately placed in his head to drain the fluid. When Dr. Soter reviewed the records from Christopher's March 2, 1987, hospitalization, she found no indication that Christopher had been blind, deaf, or brain-damaged at that time. His symptoms were seizures, sleepiness, and lethargy, but his head was not big.

Dr. Soter's opinion was that a radiology resident had misread the March CT scan as normal when it was abnormal. It showed subdural hematomas, or hemorrhages, and a skull fracture. In contrast, the July 1987 CT scan of Christopher's brain indicated that there was an excessive buildup of brain fluid and very little brain remaining. Dr. Soter explained that the excess fluid, not the subdural hematomas, destroyed the brain by compressing it, which resulted from the lack of medical care after March 1987.

If the CT scan had been properly read and interpreted in March 1987, Dr. Soter thought that DCFS would have been notified of possible child abuse. She did not know, however, what DCFS would have done because some children with skull fractures go home. If DCFS had followed up with medical care, Christopher probably would have lived, but he would have been brain-damaged. Proper follow-up of Christopher's condition would have included frequent observation of the size of his head, which would have controlled the size and condition of his head. Dr. Soter believed that there was evidence of further abuse after Christopher's March discharge from the hospital since small subdurals usually do not worsen unless there is additional abuse.

On cross-examination, Dr. Soter explained that shaken baby syndrome exists where children under one or two years of age are shaken with enough severity that the brain goes in the opposite direction from the skull, tearing vessels between the brain and skull. This causes bleeding on the brain's surface, which is called a subdural hematoma. On the outside, the child will look normal, but there will be neurological changes, such as lethargy.

In Dr. Soter's opinion, death was not caused by the CT scan being misread in March because the subdural hematomas and skull fracture were not the cause of death. The cause of death was hydrocephalus caused by Hunter's failure to follow up Christopher's care after his March discharge, which led to the fluid building up inside Christopher's brain.

John Friedman, the DCFS social worker who was assigned to Christopher's case in July 1987, testified that there had been no DCFS contact with Christopher's family prior to July 1987. Friedman took Christopher's case to court because of the medical records and the statement by Christopher's grandmother, Rosemary Dupree, who had been living with Christopher and his mother. Dupree told him that the abuse and neglect by Christopher's mother had been ongoing. Friedman testified that he probably would have sought to have Christopher removed from his home in March 1987 if he had known about the skull fracture and had been told that Hunter had caused it.

Friedman explained that physicians and health care workers are required by statute to notify DCFS when a three-month-old infant is admitted to the hospital with a skull fracture if abuse or neglect is suspected. When DCFS finds serious injuries to a child, such as a skull fracture, it makes inquiries with the doctors, hospital, family, and neighbors. If there is a determination that the child is not safe at home, DCFS normally removes the child from the home. If, however, there is no evidence of child abuse, Friedman would be suspicious and would investigate, but he would not necessarily take the child from the home. He had no opinion about whether DCFS would have taken Christopher from his home in March 1987 if Friedman had known of the fracture and subdural hematoma but did not know about any prior child abuse.

Dr. Marshall Salkin, an emergency room physician, testified as plaintiff's expert witness. It was Dr. Salkin's opinion that defendant deviated from the standard of care when the resident and attending physician misread the CT scan; when the attending physician allowed the resident to make a final diagnosis instead of reading the CT scan himself; and when the attending physician discharged Christopher without an official radiology report or CT scan reading in his chart. Dr. Salkin considered the breaches a contributing cause of Christopher's death on the ground that his injuries were not irreparable when he was discharged in March 1987. Even though Dr. Salkin agreed that Christopher was a victim of shaken baby syndrome, he did not consider Christopher's injuries irreparable because Dr. Ravindranath, who was the attending physician in

March, said that Christopher was continually improving during his hospitalization.

It was Dr. Salkin's opinion that the improper discharge caused a lack of DCFS involvement, which resulted in the lack of follow-up care, which caused irreparable brain damage prior to July 1987. He was convinced that Christopher would still be alive if the CT scan had been read properly and DCFS had been notified, because he thought that the brain damage could have been abated by prompt treatment following the March hospitalization. He believed that DCFS would have taken Christopher from his home and placed him in foster care, thus ensuring adequate follow-up care.

Linda Barstatis, Christopher's foster mother, testified about Christopher's care after he was discharged from the hospital in July 1987. Several times, defense counsel tried to question Barstatis about DCFS's policy on parents visiting their children in foster care, but the trial court sustained plaintiff's objection, struck defense counsel's statement that her questions went to the damages issue, admonished the jury to disregard her statement, and warned counsel to "[s]tay away from that area."

Defense counsel then asked Barstatis if anyone from Christopher's family tried to contact her while Christopher was living with her. The trial court sustained plaintiff's objection, stating:

"Counsel, it has no relevancy with regard to the issues in this case as far as the mother's actions are concerned.

With regard to damages, she is not a taker should this jury award any compensation at all to the estate, so her conduct on the premises in that regard once the child is in the foster home, whatever efforts, if any, she made or what the reason may or may not have been something that would be inappropriate and I am excluding it by virtue of my ruling.

I have sustained the objection four or five times now."

Several questions later, defense counsel tried to ask whether Christopher's family contacted Barstatis regarding his death. The trial court sustained plaintiff's objection and again admonished defendant's attorney.

On redirect examination, defendant's attorney attempted to ask Barstatis about Christopher's life expectancy. Plaintiff's objections were sustained.

Following Barstatis's testimony, plaintiff moved for a mistrial. The court admonished defense counsel about her persistent questioning of Barstatis on an improper subject despite being told to avoid that subject. However, the court denied the motion for mistrial on the basis that it had explained its ruling to the jury, who did not hear the answer to the questions.

Dr. Thyyar Ravindranath, the attending physician during Christopher's March admission, testified that he vaguely remembered Christopher and relied heavily on the hospital chart for his testimony. After being told by one of his residents that Christopher's CT scan was normal, Dr. Ravindranath discharged Christopher since his condition was improving. Dr. Ravindranath did not remember reading the CT scan, but a note written in the chart by the resident stated that the CT scan had been reviewed.

Dr. Ravindranath stated that the hospital's protective services team was involved in Christopher's case. Unaware of the hematomas or skull fracture, it decided that Christopher could be returned to his mother with an appointment for a follow-up visit. If the team had known the full extent of Christopher's injuries, Dr. Ravindranath admitted that it would have investigated further and may have notified DCFS.

Mildred Hunter testified that the first time she took Christopher to the hospital was for a cold. The second hospital admission occurred after she accidently dropped Christopher, then picked him up and shook him for three to five minutes. Six or seven days later, she took him to the hospital because he was not acting normally and was not taking his bottle. She never noticed that his head was swollen. At the hospital, she did not tell anyone about the dropping and shaking incident because no one asked. Hunter denied that she was ever told to take Christopher to the clinic following his discharge.

Latonya Hunter, one of Christopher's sisters, testified that she was eight or nine years old when she lived with Christopher. She played with him and gave him his bottle occasionally. On cross-examination, Latonya stated that she did not know how her brother died. When defense counsel asked, "Where is your mother today?" the trial court sustained the objection, then heard plaintiff's motion for a mistrial out of the jury's presence. Plaintiff argued that defense counsel repeatedly questioned the witnesses after being admonished not to ask specific questions, screamed at plaintiff's attorney several times, smirked, and laughed. The court stated that the question about Hunter "was grossly out of line" and was harmful, but it would consider the extent of the harm. After admonishing defense counsel to refrain from showing her emotions with facial expressions during the trial, the trial court took the motion under advisement. Later, the court denied the motion for a mistrial on the basis that not all the comments were improper and the improper comments did not rise to the level required for a mistrial.

Dr. Sharon Byrd, a pediatric neuroradiologist, testified as defendant's expert witness. After explaining shaken baby syndrome,

also known as the shaken impact syndrome, she stated that she had identified hundreds of victims of shaken baby syndrome.

Dr. Byrd testified that Christopher's March CT scan showed a skull fracture, subdural hematoma, and an area of dying brain cells, called an infarction, which involved 66% to 80% of Christopher's forebrain. Dr. Byrd discussed how the infarction was caused by a sheering injury that involved the brain's vessels. That infarction, not the subdural hematomas or the skull fracture, was the cause of Christopher's death. Since there was no treatment available for the infarction, Dr. Byrd opined that no medical treatment could have prevented the progression of the brain damage shown in the March CT scan and the outcome would have been the same even if the CT scan had been properly read in March. Accordingly, Dr. Byrd believed that taking Christopher out of his home after his March discharge would not have changed the outcome.

Dr. Byrd disagreed with Dr. Soter's interpretation of the March CT scan and her opinion that hydrocephalus caused Christopher's death. Dr. Byrd stated that Dr. Soter did not see the infarctions, or dying brain cells, present in the March CT scan. Dr. Byrd believed that the subdural hematomas that were present in March caused Christopher's big head, not hydrocephalus.

Dr. Byrd testified that Christopher's death was caused by the shaken impact syndrome, which occurred when his mother shook him and threw him to the ground. Following that injury, Christopher's life expectancy was one to two years. She then stated that his injuries were consistent with being shaken for 10 to 15 minutes. On cross-examination, Dr. Byrd said that defendant's attorney had "recently" told her that Christopher had been shaken for 15 minutes and dropped to the floor.

After closing arguments and deliberations, the jury returned a verdict in favor of defendant on all counts. Subsequently, the trial court denied plaintiff's motion for a new trial.

There was no dispute that Hunter shook and dropped Christopher, causing the subdural hematoma and skull fracture, then waited approximately one week before taking him to the hospital, where she failed to report the abuse. There also was no dispute that the March 6, 1987, CT had been misread. The ultimate issue at trial was whether misreading the CT scan in March was a proximate cause of death or whether the damage was so great in March 1987 that Christopher was irreparably injured and would have died even if the CT scan had been properly interpreted.

Plaintiff asserts that Dr. Byrd's expert opinion should have been excluded because it was conjecture based on being told by defendant's

attorney that Christopher had been shaken for 10 to 15 minutes, which was not proven.

■ Although an expert may not guess, conjecture, or surmise as to a possible cause for the injury, she can testify in terms of possibilities or probabilities as long as the opinion is based on a reasonable degree of medical certainty. *Baird v. Adeli*, 214 Ill. App. 3d 47, 65, 573 N.E.2d 279 (1991). Dr. Byrd testified that her opinion was based on her review of the March 6, 1987, and July 6, 1987, CT scans; the July 13, 1987, MRI; Dr. Soter's testimony at Hunter's criminal trial; Dr. Salkin's deposition; and the hospital medical records from March and July. She said nothing about relying on the statement by defendant's attorney that Christopher had been shaken for 10 to 15 minutes, and there is nothing in the record to suggest that she did so.

Dr. Byrd testified as follows:

"[Christopher's death] was caused by the shaken impact syndrome. It was caused by the mother shaking Christopher Hunter, throwing him to the ground, lacerating these vessels involving his brain that produced the infarction that ended up producing the brain damage. That's what caused Christopher Hunter's death."

At the close of her testimony, Dr. Byrd was asked:

"[D]o you have an opinion based on a medical—reasonable degree of medical certainty whether or not the injuries that were caused to Christopher Hunter that showed up on the March of '87— March 6th of 1987 CT scan are consistent with the child having been shaken—severely shaken for 10 to 15 minutes?"

Dr. Byrd answered "Yes." On cross-examination, she stated that defendant's attorney had told her "recently" that Christopher had been shaken for 10 to 15 minutes.

Dr. Byrd's opinions regarding the existence of injury shown on the March CT scan, the severity of that injury, and her prognosis were properly based on her review of the medical records and her experience in diagnosing shaken baby syndrome. See *Aguinaga v. City of Chicago*, 243 Ill. App. 3d 552, 563, 611 N.E.2d 1296 (1993). They were well within her expertise since she is a neuroradiologist who is experienced in diagnosing shaken baby syndrome. It was for the jury to decide whether Dr. Byrd's testimony was believable and whether her testimony should have been weighed more or less favorably than the testimony of the other doctors. *People v. Mullen*, 141 Ill. 2d 394, 403, 566 N.E.2d 222 (1990); *People v. Collins*, 106 Ill. 2d 237, 261-62, 478 N.E.2d 267 (1985).

Furthermore, the length of time Christopher had been shaken was not crucial to the determination of this case. There is no dispute

that Christopher had been severely shaken. Hunter testified that she shook Christopher three to five minutes before dropping him to the ground. Even if Christopher had been shaken only for three to five minutes, instead of 10 to 15 minutes, that would not have changed the amount of brain damage present when Christopher was admitted to the hospital in March 1987 after being shaken by his mother. Therefore, Dr. Byrd's testimony was properly admitted into evidence.

■ Next, plaintiff asserts that she was deprived of a fair trial because the trial court erroneously denied her three mistrial motions and her motion for a new trial. Plaintiff's first motion for a mistrial was based on the defense attorney's opening statement remarks that Hunter shook Christopher for 15 minutes, which violated an *in limine* order, and that plaintiff's expert was paid to review cases. Plaintiff waived this argument because her post-trial motion was not sufficiently specific to preserve the issue. *Brown v. Decatur Memorial Hospital*, 83 Ill. 2d 344, 348, 415 N.E.2d 337 (1980); *Balsley v. Raymond Corp.*, 232 Ill. App. 3d 1028, 1029, 600 N.E.2d 424 (1992).

The second motion for a mistrial was based on defendant's attempt to elicit testimony from Linda Barstatis, Christopher's foster mother, that Christopher's family did not visit him, even after the court had sustained plaintiff's objections four or five times and had admonished defendant's attorney to "stay away" from that line of questioning. The defense attorney also asked Barstatis about Christopher's life expectancy and whether his family contacted Barstatis after his death. The trial court repeatedly sustained plaintiff's objections to those questions.

Defendant argues that those questions were a proper attempt to elicit testimony to support an argument mitigating damages for the loss of the child's society. If any error was committed, defendant claims that it was cured when the trial court sustained plaintiff's objections, reprimanded the defense attorney in the jury's presence, instructed the jury that the issue was not relevant, and struck the defense attorney's statement that her questions went directly to the issue of damages.

The third motion for a mistrial was based on an exchange that occurred during defendant's cross-examination of Christopher's sister, Latonya. First, defendant's attorney stated:

"I would also object to the witness looking at her counsel when I'm asking questions.

[PLAINTIFF'S ATTORNEY]: Oh, please. That's totally improper and I have a motion outside the presence of the jury, your Honor."

When defense counsel asked, "Where is your mother today?" the

trial court sustained plaintiff's objection, then heard plaintiff's motion for a mistrial out of the jury's presence. Plaintiff argued that defense counsel repeatedly questioned the witnesses after being admonished not to ask certain questions, screamed at plaintiff's attorney several times, smirked, and laughed. The court stated:

> "That last question you were grossly out of line ***. This jury is not naive. They were told from day one that the lady is presently serving a 25-year sentence."

The court said that the question about Hunter was harmful, but it would consider the extent of the harm. After admonishing defense counsel to refrain from showing her emotions with facial expressions during the trial, the trial court took the motion under advisement. The motion was later denied on the basis that not all the comments were improper and that the improper comments did not rise to the level required for a mistrial.

A mistrial is necessary when it appears that the jury was so influenced and prejudiced that it could not have been fair and impartial and that the damaging effect could not be cured by admonitions and instructions. *People v. Clark*, 231 Ill. App. 3d 571, 574-75, 596 N.E.2d 642 (1992). When considering a motion for a new trial, the trial court will order a new trial if a trial error or an accumulation of trial errors prejudiced a party or unduly affected the trial's outcome. *Tellone v. North Shore Dodge, Inc.*, 271 Ill. App. 3d 885, 888, 649 N.E.2d 625 (1995); *Brown v. Arco Petroleum Products Co.*, 195 Ill. App. 3d 563, 565, 571-72, 552 N.E.2d 1003 (1989).

Whether to declare a mistrial and/or to grant a new trial rests within the trial court's sound discretion and will not be reversed unless the decision is a clear abuse of discretion. *Maple v. Gustafson*, 151 Ill. 2d 445, 455, 603 N.E.2d 508 (1992); *Bianchi v. Mikhail*, 266 Ill. App. 3d 767, 777, 640 N.E.2d 1370 (1994).

After carefully considering the record, we conclude that the trial court did not abuse its discretion in denying the motions for mistrial and motion for a new trial. The trial court sustained objections to defense counsel's improper questions, admonished the jury to disregard questions that were stricken, sustained objections to the question about Hunter's whereabouts before the witness answered, and fully explained its rulings regarding the questioning of Barstatis. Moreover, the jury had already been told that Hunter was serving a sentence for Christopher's murder.

The trial court kept a close rein on the questioning. It was very aware of any improper conduct and carefully considered any potential prejudice. Therefore, we conclude that the trial court properly used its discretion in denying the motions for mistrial and the motion for a new trial.

■ The next issue is whether the trial court erred in barring plaintiff's additional expert witness, Dr. Liza Squires, from testifying at trial. This case was filed in 1990 and discovery was conducted through 1994. The initial trial date was July 26, 1994. It was continued by agreement to October 24, 1994, and a final trial date was subsequently set for January 4, 1995. On November 4, 1994, 60 days before trial, plaintiff named Dr. Squires as an additional expert witness to Dr. Salkin. Pursuant to a motion by defendant, the trial court barred her testimony.

An expert witness must be disclosed within 90 days after the substance of her opinion is known, at the first pretrial conference, or on an agreed schedule, but no later than 60 days before the trial begins. *Boyce v. Risch*, 276 Ill. App. 3d 274, 279, 657 N.E.2d 1145 (1995); 134 Ill. 2d. R. 220(b). The imposition of appropriate sanctions for a violation of the discovery rules is a matter within the trial court's sound discretion (*Sohaey v. Van Cura*, 158 Ill. 2d 375, 381, 634 N.E.2d 707 (1994); *Kosinski v. Inland Steel Co.*, 192 Ill. App. 3d 1017, 1027, 549 N.E.2d 784 (1989)) and can include disqualifying that wit-ness at trial (*Cleveland Wrecking Co. v. Central National Bank*, 216 Ill. App. 3d 279, 294, 576 N.E.2d 1055 (1991)). In exercising discretion in sanctions, the trial court must balance the need for discovery with the need to resolve issues on their merits. *Flanagan v. Redondo*, 231 Ill. App. 3d 956, 962, 595 N.E.2d 1077 (1991). Once sanctions are imposed, the sanctioned party has the burden of showing that noncompliance was reasonable. *Flanagan*, 231 Ill. App. 3d at 962.

We find that the trial court did not abuse its discretion when it barred the expert testimony of Dr. Squires since her Rule 220 interrogatories failed to adequately state her opinions or show how they would have been different from Dr. Salkin's. Furthermore, her disclosure just 60 days prior to trial can be considered untimely given the facts of this case.

■ Finally, plaintiff argues that the jury's verdict must be reversed because it was against the manifest weight of the evidence. *Maple v. Gustafson*, 151 Ill. 2d 445, 454, 603 N.E.2d 508 (1992). A verdict is against the manifest weight of the evidence if the opposite conclusion is clearly evident or where the jury's findings are unreasonable, arbitrary, and not based on any of the evidence. *Maple*, 151 Ill. 2d at 454.

Dr. Byrd, a pediatric neuroradiologist, testified that Christopher's brain had a subdural hematoma, skull fracture, and an infarction, which was an area of dying brain cells. The damage to Christopher's brain was irreparable and his life expectancy in March 1987 was one to two years. Since there was no treatment available, the outcome

would have been the same even if the CT scan had been properly read in March 1987.

Although Dr. Soter and Dr. Salkin believed that Christopher would have been taken from his home if DCFS had been notified, John Friedman, Christopher's DCFS caseworker in July 1987, had no opinion regarding whether DCFS would have removed Christopher in March 1987 if he had known about the hematomas and skull fracture, but not about actual child abuse. We conclude that the jury's verdict was not against the manifest weight of on the evidence.

Based on the foregoing, the trial court judgment is affirmed.

Affirmed.

McNAMARA and BURKE, JJ., concur.