filed April 6, 2006.
IN THE APPELLATE COURT OF ILLINOIS
THIRD DISTRICT
A.D., 2005

3--04-0725

| | | |
|---|---|---|
| TONI THORNTON, Individually | ) | |
| and as Special Administrator of the | ) | |
| Estate of Jason Anthony Ebner, | ) | |
| Deceased | ) | Appeal from the Circuit Court |
|     Plaintiff-Appellant, | ) | For the 12th Judicial Circuit |
| | ) | Will County, Illinois |
| | ) | |
|     v. | ) | |
| | ) | No.   01 L 20 |
| | ) | |
| FRANCISCO J. GARCINI, | ) | Honorable Robert C. Lorz |
|     Defendant-Appellee. | ) |     Judge, Presiding |

JUSTICE O'BRIEN delivered the opinion of the court:

Following a jury trial, defendant Francisco Garcini, M.D., was found not liable for wrongful death, and intentional infliction of emotional distress in an action brought by plaintiff Toni Thornton in connection with the death at birth of her baby, Jason Ebner. Thornton appeals from the trial court's order entering judgment in favor of Garcini. We reverse the trial court and remand the cause for a new trial.

FACTS

The record indicates that on August 28, 2000, at approximately 6 to 6:30 a.m, plaintiff Toni Thornton was admitted to Silver Cross Hospital in Joliet, Illinois. Although there is some question about the exact time she was admitted, the records indicate that at

6:30 a.m. certain medications were given to Thornton based on instructions given by defendant Garcini via phone to the treating nurses. Garcini had seen Thornton on one other occasion, August 21, 2000. During this appointment, Garcini took a medical history of Thornton that included the fact that she had previously given birth prematurely. An approximate date of April 1, 2000, was noted for her last menstrual period. When Thornton was admitted to the hospital on August 28, 2000, the notation on the admission form indicated a gestational age for the baby of 23 5/7 weeks, based on a last menstrual period of March 18, 2000.

Dr. Garcini was contacted at home regarding Thornton's admission to the hospital. Garcini ordered the administration of certain drugs to Thornton and ordered an ultrasound administered. Garcini testified he took a shower and waited at home for information regarding the test results. Garcini testified that from the information given to him by the nurses he did not believe Thornton was going to imminently deliver. He also indicated that at 23 5/7 weeks, Thornton would be considered a high risk delivery. Garcini was paged a second time at home. He was in the shower and did not immediately answer the page.

By the time Garcini phoned the hospital, he was informed that Thornton had partially delivered Jason. Jason was in a breech position and he became entrapped at the head. Garcini testified he instructed the nurses not to force the full delivery of Jason. No other obstetricians were available at the hospital. Garcini testified he was aware that if Jason was not fully delivered in a short period of time he would die. The partial delivery occurred at approximately 7:10 a.m. Garcini arrived at the hospital at 8:20 a.m., 35 minutes after he left home, and approximately 1 hour and 50 minutes after he was first contacted. Once at the hospital, Garcini removed Jason, who was then deceased, from Thornton. Jason's

2

weight was 907 grams or approximately 2 pounds.

Dr. Charles Bird, an obstetrician-gynecologist, testified as Thornton's expert. Bird testified that in his opinion Garcini had violated the standard of care in not leaving immediately for the hospital once he was informed Thornton was in labor. Bird based his opinion on Thornton's previous history, the term of the pregnancy, her condition as described to Garcini by the nurses and the fact that Garcini could not anticipate that another doctor might be available to aid Thornton.

Bird stated that based on Jason's weight, he estimated his gestational age at no lower than 26 weeks and as high as 28 weeks. Bird did not believe Jason was a 23-week-old baby, as, in his opinion, at 23 weeks, babies weigh a little over one pound, not two pounds. Dr. Bird admitted that a comparison of gestational age and gestational weight to arrive at an adjusted gestational age was a process used by neonatologists, not obstetricians. Dr. Bird's opinion included the following conclusions: Jason would have had a chance to survive if Garcini, the hospital and the nurses had not breached the required standard of care; he could have been delivered successfully; and had he been delivered successfully, Jason would have had an 85% chance of survival. Dr. Bird agreed that 74% of infants at 24 weeks do not survive to a point where they can be successfully discharged from the hospital. Dr. Bird also acknowledged the doctor who performed Jason's autopsy noted the baby's gestational age as approximately 23 weeks.

Dr. DuBoe, a obstetrician/gynecologist, testified as an expert for Garcini. DuBoe testified that, in his opinion, Garcini complied with the standard of care in his treatment of Thornton. In Duboe's opinion, when Garcini was first notified of Thornton's admission to the hospital, there was no indication she was going into rapid delivery.

3

Dr. Hulac, a neonatologist, testified in Garcini's defense. Hulac opined that a weight of 907 grams could be consistent with a 23- or 24-week-old fetus as well as a 26- or 27-week-old fetus. Hulac pointed to the fact that Jason's eyelids were still fused as indicative that at delivery he was younger than 26 weeks. Basing his opinion on the survivability of a 23- or 24-week-old fetus, Hulac opined it was unlikely Jason would have survived to 28 days. Hulac also testified that had Jason survived, he would have had profound struggles, including the possibility of loss of intestine, liver damage, lung damage, eye damage, ear damage, and brain damage.

At the close of the trial, the trial court, as part of the jury instructions and over Thornton's objection, gave the following instruction: "In determining pecuniary loss, you may consider what the evidence shows concerning the following: His age, his health; his physical and mental characteristics; the relationship between Jason Ebner, decedent, and his parents and brother." The jury found in favor of Garcini and the trial court entered an order against Thornton.

Thornton filed a posttrial motion, stating, in part, that she had received information indicating that jurors had been exposed to prejudicial extrinsic information during their deliberations. The trial court granted Thornton's request to seek limited discovery on whether the jurors' verdict may have been improperly influenced by the articles in question. In granting leave to Thornton to conduct the discovery, the trial court stated:

> "[I]t would be possible for a juror to come to the conclusion *** that from the proximate cause end that it didn't matter what Dr. Garcini did ***they could have found that it didn't make any difference whatsoever because even if Dr. Garcini had been standing there, there may not have been anything that

4

he could have done *** that if this baby had been delivered that the baby simply would not have survived so that it didn't matter. And these articles clearly discuss those issues; and more importantly discuss those issues in the context of other medical experts rendering opinions with respect to those issues."

Each of the jurors was sent a questionnaire. They were asked if they had read any of the following three articles: "A Fragile Fighter," "In Naperville, a Very Small Miracle," or, "'Preemie' Care Advances." One juror responded he had read "'Preemie' Care Advances." He indicated he had not discussed the article with any of the other jurors. A second juror admitted to having read "A Fragile Fighter," and also denied having discussed the article with any of the other jurors. The remaining jurors all responded that they had not read any of the articles. The questions on the juror questionnaire were framed so that only those jurors who admitted to reading an article were required to respond to the question of whether they had discussed the articles with any other jurors.

The article, "'Preemie Care Advances," included the statement that Silver Cross Hospital (the hospital to which Thornton was admitted) was equipped to take care of premature babies born at 28 weeks who weighed more than three pounds, three ounces. Two doctors, practitioners of newborn and neonatal care, were quoted in the article. The doctors made statements regarding the survivability of premature babies and the health and medical concerns for premature infants. One doctor stated that a 23-week baby weighing one pound had only a 5%-10% chance of survival, whereas a 27-week baby weighing two pounds had a 90% survival rate. The other doctor stated that some of the concerns with respect to premature babies included possible blindness, and hemorrhage

5

of the brain, for which there is no treatment. The other article, "A Fragile Fighter," described the concern of a mother who ultimately gave birth to a 27-week-old baby. The article referred to the mother's fear that if she failed to carry the baby beyond 24 weeks, "the baby would almost certainly die."

After receipt of the jurors' questionnaires, the trial court again stated the articles read by the jurors concerned an issue critical to the case. The trial court also stated the articles were supportive of Thornton's position in that the general tenor of the articles was that medical advances give premature babies a better chance of survival than in the past. For this reason, the trial court determined the articles did not present material to which Thornton had not had a chance to respond. The trial court concluded there was "very little probability that the articles had an adverse impact on [the] case," and declared the trial fair.


Thornton also asserted in her posttrial motion that the trial court erred in giving an instruction that allowed the jury to consider elements for determining pecuniary loss that were not relevant to her claims for loss of society and were unduly prejudicial. The trial court denied Thornton's posttrial motion and she follows with this appeal.

ANALYSIS

On appeal, Thornton asserts the trial court erred in failing to grant a new trial where newspaper articles that had been read by some of the jurors may have improperly influenced the verdict. "Not every instance in which extraneous information reaches [a] jury constitutes reversible error." People v. Collins, 351 Ill. App. 3d 175, 179, 813 N.E.2d 285, 289 (2004). However, when such information reaches the jury, it is presumptively prejudicial. Collins, 351 Ill. App. 3d at 179, 813 N.E.2d at 289. The party challenging the

6

verdict needs to show only that the information relates directly to something at issue in the case which the losing party did not have the opportunity to refute and that may have influenced the verdict. Haight v. Aldridge Electric Co., 215 Ill. App. 3d 353, 369, 575 N.E.2d 243, 254 (1991). The losing party need not prove actual prejudice. Haight, 215 Ill. App. 3d at 369, 575 N.E.2d at 254. The burden shifts to the nonmoving party to show a lack of prejudice. Collins, 351 Ill. App. 3d at 181, 813 N.E.2d at 290. The standard to be applied is whether the conduct at issue involved such a probability of resulting prejudice that the verdict must be deemed inherently lacking in due process. See Collins, 351 Ill. App. 3d at 180, 813 N.E.2d at 290. The vital question is whether the jurors exposed to the information, or any of them, were influenced and prejudiced to such an extent that they would not or could not be fair and impartial jurors. See Van Hattem v. K mart Corp., 308 Ill. App. 3d 121, 129, 719 N.E.2d 212, 220 (1999). "A verdict may stand only if it is 'obvious' that no prejudice accrued to the defendant." Collins, 351 Ill. App. 3d at 179-80, 813 N.E.2d at 289-90, quoting People v. Hobley, 182 Ill. 2d 404, 462, 696 N.E.2d 313, 341 (1998).

With respect to the effect of a supposedly unbiased news report, the impact on the jury cannot be underestimated when the report has articulated, bolstered and supported the nonmovant's theory of the case. See Van Hattem, 308 Ill. App. 3d at 131, 719 N.E.2d at 221. A trial court should not consider conclusive a juror's statement that reading a prejudicial newspaper article has not influenced him. Van Hattem, 308 Ill. App. 3d at 130, 719 N.E.2d at 220. The determination of whether prejudice has occurred rests in the sound judicial discretion of the court after it has considered all the facts and circumstances. Van Hattem, 308 Ill. App. 3d at 130, 719 N.E.2d at 220 (finding trial court abused its discretion in denying defendant's motion for a mistrial where the court questioned only those jurors

7

who had seen the prejudicial newscast, but not those who had heard of the program but not seen it).

In the instant case, a crucial issue in the proceedings was whether Garcini breached a standard of care in delaying to proceed directly to Silver Cross Hospital once he learned his patient was in premature labor there. Also the subject of extensive testimony was the gestational age of the baby, Jason, and his relative ability to survive outside the womb. The gestational age that was discussed varied from 23 to 28 weeks. Garcini argues that the survivability of baby Jason was not relevant to the issue of liability, an issue decided in Garcini's favor. Further, Garcini asserts, the parties' experts agreed that if baby Jason's gestational age was between 23 to 24 weeks, his chances for survival were gravely threatened. As the trial court pointed out, however, the gestational age and survivability of Jason did relate to the crucial question of whether Dr. Garcini proximately caused the death of Jason. Although the articles, in general, dealt with medical advancements in the care of premature babies, they also bolstered the idea that at the lower end of the gestational age spectrum discussed, premature babies were unlikely to survive. These articles had the potential to influence anyone who read or discussed them to conclude that, in the words of the trial court, " if this baby had been delivered that the baby simply would not have survived so that it didn't matter."

The trial court correctly surmised that the articles related to a crucial issue in the case: whether Dr. Garcini proximately caused the death of baby Jason. Following an investigation, by way of a "fill-in-the-blank" questionnaire, the trial court concluded the jurors were not prejudiced by exposure to the articles. The jurors were not personally questioned by the court and only those jurors who admitted reading an article were required

8

to respond to a query of whether the articles had been discussed during deliberations. The results of this process did not satisfy Garcini's burden to demonstrate that no juror was prejudiced by these extraneous materials.   If any juror exposed to the articles in any way was in doubt as to whether the cause of baby Jason's death was the inaction of Dr. Garcini or the baby's inability to survive due to his gestational age, the extraneous articles could have tipped the scales, resulting in an improperly influenced verdict.

We find that the articles related to a crucial issue of the case. Thornton did not have the opportunity to question the information or the sources relied upon in the articles. The court did not conduct a thorough inquiry into the possibility that any one of the jurors may have been improperly influenced by the articles.  For these reasons, it is not "obvious" that no prejudice accrued to Thornton and it was an abuse of discretion for the court to conclude otherwise.  We reverse the trial court and remand the cause for a new trial.

We also address two further issues Thornton has raised on appeal that may arise on retrial.

The first issue is whether the trial court erred in allowing a jury instruction which included in its definition of pecuniary loss, the age, health, physical and mental characteristics of the decedent and the relationship of the decedent with parents and siblings.  Given that the instruction that the trial court gave is a standard Illinois pattern instruction, the only issue is whether the instruction is clear enough to avoid confusing the jury and whether it fairly and accurately states the applicable law.  Hendrix v. Stepanek, 331 Ill. App. 3d 206, 215, 771 N.E.2d 559, 567 (2002).  Whether a jury instruction is an accurate statement of law is a question to be reviewed *de novo*. Luye v. Schopper, 348 Ill. App. 3d 767, 773, 809 N.E.2d 156, 161 (2004).

9

Under Illinois law, when a child dies as a result of the tortious acts of another, the parents are presumed to have suffered a pecuniary injury in the form of loss of society. Simmons v. University of Chicago Hospital & Clinics, 247 Ill. App. 3d 177, 182, 617 N.E.2d 278, 283 (1993).   This loss is compensable in a wrongful death action even in the case of stillbirths. Seef v. Sutkus, 145 Ill. 2d 336, 338-39, 583 N.E.2d 510, 511-12 (1991) (finding that under the Wrongful Death Act, regardless of the state of gestation, an unborn fetus is recognized as a person and parents may recover damages for pecuniary loss resulting from the death of the unborn fetus).  Within the concept of loss of society is the notion of the future companionship, guidance, love, advice, affection and comfort that would have been exchanged between the parents and the child but for the defendant's negligence. Simmons, 247 Ill. App. 3d at 182-83, 617 N.E.2d at 283.  The parents' right to recovery for loss of society does not depend upon whether there has been some exchange of society in the past, but whether but for defendant's negligence, society would have been exchanged. Seef, 145 Ill. 2d at 342, 583 N.E.2d at 513 ( Miller, J., specially concurring).  Although consideration of the length, intensity, and quality of the parent-child relationship may in some cases be useful in measuring the magnitude of the parents' loss, it does not determine whether a loss occurred. Seef, 145 Ill. 2d at 344, 583 N.E.2d at 514 (Miller, J., specially concurring).

In the instant case, the instruction at issue that was given to the jury read, in part, as follows:  "In determining pecuniary loss, you may consider what the evidence shows concerning the following: His age, his health; his physical and mental characteristics; the relationship between Jason Ebner, decedent, and his parents and brother."  The instruction appears to instruct the jury that the loss of Jason's society was somehow dependent on

10

some relationship that had been established in the past.  This is not the state of the law in Illinois and may have misled the jury into believing damages for loss of society were not appropriate because Jason did not live long enough to have had a relationship with his family.  Any instruction given to the jury with respect to the parents' loss of Jason's society should clearly indicate that the determination of a loss is not dependent upon the family having enjoyed a past relationship with Jason, but is a consideration of the future companionship the family may have enjoyed.

The final issue we address is whether the trial court erred in allowing Garcini's expert to testify about the likelihood that Jason would have been born with disabilities.  A trial court's decision to admit evidence will not be disturbed absent an abuse of discretion. Gill v. Foster, 157 Ill. 2d 304, 312-313, 626 N.E.2d 190, 194 (1993).  Evidence that is relevant may be excluded if its probative value is outweighed by such factors as prejudice, confusion, or potential to mislead the jury. Gill, 157 Ill. 2d at 313, 626 N.E.2d at 194.

If liability is found in a wrongful-death-of-a-child action, the presumption is that the parents have suffered a pecuniary injury in the form of a loss of the child's society. Bullard v. Barnes, 102 Ill. 2d 505, 517-19, 468 N.E.2d 1228, 1234-35 (1984). The presumption is a rebuttable one.  Defendants may, for example, present evidence that the parent and child were estranged, or that a set-off for child-rearing expenses is appropriate. Bullard, 102 Ill. 2d at 517,  468 N.E.2d at 1234. The defendant may produce evidence that irrespective of the defendant's negligence, the child was unhealthy, or unlikely to live beyond majority. Smith v. Mercy Hospital & Medical Center, 203 Ill. App. 3d 465, 477, 560 N.E.2d 1164, 1172 (1990).  In Flynn v. Vancil, the jury found the defendant liable but awarded no damages for pecuniary loss where the two-week old child was suffering from an incurable

11

congenital condition. <u>Flynn v. Vancil</u>, 41 Ill. 2d 236, 240-41, 242 N.E.2d 237, 240-41 (1968). Ultimately, it is for the jury, as the trier of fact, to hear the contrary evidence, weigh the facts and decide whether to award damages. <u>Smith</u>, 203 Ill. App. 3d at 478, 560 N.E.2d at 1172.

Thornton asserts that it is inappropriate for Garcini to imply that the potential disabilities of baby Jason mitigate the loss of society suffered by his parents. The argument is based, in part, on the case of <u>Dralle v. Ruder</u>,124 Ill. 2d 61, 529 N.E.2d 209 (1988). In <u>Dralle</u>, the court concluded that damages for loss of society resulting from nonfatal injuries to a child were not recoverable. <u>Dralle,</u> 124 Ill. 2d at 71, 529 N.E.2d at 213-14. The <u>Dralle</u> court noted, in part, that allowing recovery for loss of society in a nonfatal injury case would result in the "'unseemly spectacle'" of parents disparaging the "'value'" of their children in open court so as to minimize any offset argued by the defendant. <u>Dralle</u>, 124 Ill. 2d at 71, 529 N.E.2d at 213, quoting <u>Cockrum v. Baumgartner</u>, 95 Ill. 2d 193, 202 (1983). The <u>Dralle</u> court considered such a situation to be in sharp contrast with the situation in a wrongful death action, where the opposite is argued, and loss is presumed. <u>Dralle</u>, 124 Ill. 2d at 71, 529 N.E.2d at 213. As stated in <u>Vitro v. Mihelcic</u>, the <u>Dralle</u> decision was validly based on the rationale that unlike wrongful death actions which are predicated upon statutory law, the legislature has not spoken on the issue of loss of society as related to a child who suffers nonfatal injuries. <u>Vitro v. Mihelcic</u>, 209 Ill. 2d 76, 90, 806 N.E.2d 632, 639 (2004).

In the instant case, Garcini presented opinion testimony that it was likely baby Jason would not have survived after birth or, if he had, he would have struggled with birth defects. It was for the jury to weigh this evidence and determine whether the evidence rebutted to any degree the presumption of loss of society. Based on their knowledge and experience,

and the weight they gave the testimony, the jurors could have concluded there was no potential for serious birth defects, or that if baby Jason survived with defects, there would be no impact on the society, some degree of diminishment of the full enjoyment of society, or an enhanced value to the society the family would have enjoyed. It was not error for the trial court to allow the defendant's evidence.

For the foregoing reasons, the judgment of the circuit court of Will County is reversed and the cause remanded for a new trial.

Reversed and remanded.

SCHMIDT, P.J., concurring in part and dissenting in part.

BARRY, J., concurs.

PRESIDING JUSTICE SCHMIDT, concurring in part and dissenting in part:

The majority correctly states that the determination of whether prejudice has occurred as a result of extrajudicial evidence entering the jury room rests in the sound judicial discretion of the court after it has considered all the facts and circumstances. Slip op. at 7. I am of the opinion that the trial court did not abuse its discretion with respect to its findings regarding the extrajudicial evidence and, therefore, respectfully dissent. This court has said many times that an abuse of discretion occurs only when no reasonable person would take the view adopted by the trial court. *In re Marriage of Sawicki*, 346 Ill. App. 3d 1107, 806 N.E.2d 701 (2004). In determining whether a trial court abused its discretion, the question is not whether we agree with the trial court but, rather, whether the trial court, in the exercise of its discretion, acted arbitrarily without the employment of

13

conscientious judgment or, in the view of all the circumstances, exceeded the bounds of reason and ignored recognized principles of law so that substantial injustice resulted. *In re Marriage of Lee*, 78 Ill. App. 3d 1123, 398 N.E.2d 126 (1979). If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *In re Marriage of Lee*, 78 Ill. App. 3d at 1127.

The trial court expended much time and effort in reaching its decision that the jury was not prejudiced by the extrajudicial evidence. The record reveals that Judge Lorz did a superb job of reviewing the facts and evidence admitted in the case, case law regarding extrajudicial evidence, the actual extrajudicial evidence that reached the jury, and the parties' arguments prior to arriving at his decision. To say that he acted arbitrarily without the employment of conscientious judgment or he exceeded the bounds of reason and ignored recognized principles of law is unsupported by the record in my opinion.

Judge Lorz determined that it was obvious that no prejudice resulted from the two jurors' knowledge of the two articles in question. Ten of the twelve jurors noted in their questionnaires that they did not read the articles which contained the extrajudicial information. Two of the jurors admitted reading the articles, but noted they did not "discuss any of the newspaper articles *** with any other jurors." The trial court could certainly have reasonably concluded that the winning party met its burden of proving no prejudice to the losing party occurred where the complained-of extrajudicial articles were not read by 10 jurors and not discussed by the two jurors who admitted reading them. At a minimum, reasonable minds could differ regarding whether prejudice occurred, in which case affirmation is mandated, given the abuse of discretion standard.

Judge Lorz's careful analysis, however, did not end there. He expended a great

14

deal of energy to review the content of the articles in contrast to the content of the losing party's evidence.  His analysis resulted in a finding that the two were substantially similar.  In other words, he found that there was nothing contained in the articles that would prejudice the losing party given the evidence the losing party put on to support its case-in-chief.  I agree.

The majority states that the articles bolster "the idea that at the lower end of the gestational age spectrum discussed, premature babies were unlikely to survive."  Slip op. at 8.  Specifically, what the articles say is:

"At 24 weeks, she said, she and her husband were faced with
a decision: Either deliver the baby, which would almost certainly die
at that point because of its prematurity, or continue with the pregnancy
and hope the baby continued to live.

Babies can even survive born at 20 weeks, weighing only three-quarters
of a pound, she said, although survival rates are low for these very early
babies.

Mathewson said a 23-week baby that weighs one pound has only a five
to 10 percent chance of making it.  But a 27-week preemie that weighs two
pounds, a birth that isn't all that uncommon these days, she says, has a 90
percent survival rate.

Mathewson said that the babies are particularly susceptible to the brain
injuries when they are younger than 32 weeks, when the brain's blood vessels
are very fragile."

The plaintiff's own expert, Dr. Charles Bird, stated that if the baby "is only 23 weeks

15

[then] the poor little soul is not going to survive for obvious reasons." The trial court examined that specific testimony in light of the statements made in the extrajudicial articles. While the majority correctly states that the age of the fetus was disputed, it is undisputed that the evidence put forth by the losing party indicated that if the fetus was, in fact, 23 weeks old, then the chances of it surviving were incredibly slim. Nothing in these articles states any differently. In fact, the statement in the articles that "babies can even survive born at 20 weeks, weighing only three-quarters of a pound," arguably helped the plaintiff's case.

The trial judge acknowledged, as does the majority, that once the losing party shows that extrajudicial information which relates to a crucial issue in the case reaches the jury, the winning party then has the burden of proving that the information did not prejudice the losing party. *People v. Collins*, 351 Ill. App. 3d 179-80. Again, as the majority correctly states, the determination of whether prejudice has occurred rests in the sound judicial discretion of the trial court after it has considered all of the facts and circumstances. *Van Hattem*, 308 Ill. App. 3d at 130.

I simply disagree with the majority's conclusion that the results of the process engaged in by the trial court did not satisfy the winning party's burden to demonstrate that no juror was prejudiced by the extrajudicial materials. Ten jurors denied reading the materials. The two jurors that admitted reading the materials denied discussing them with anyone. The materials themself contain no substantive information that conflicts with the losing party's own expert's testimony. If anything, the articles substantively help the losing party's case. Given the fact that the articles substantively support the losing party's expert testimony, I fail to see how they could prejudice the losing party. There was nothing in the

16

material that plaintiff would have refuted had the material been properly before the jury. Given these facts, I disagree with the majority's assertion that no reasonable person could take the view adopted by the trial court and would therefore affirm.

Furthermore, I find reversible error was not committed when the jury was instructed. The jury rendered a general verdict on liability in favor of defendant. "[I]t is well established that where a defendant is found not liable, alleged errors pertaining solely to damages do not afford grounds for a reversal.>>" *Dabros v. Wang*, 243 Ill. App. 3d 259, 269, 611 N.E.2d 1113, 1120 (1993) quoting *Schuchman v. Stackable*, 198 Ill. App. 3d 209, 231 (1990).

Finally, I concur with the majority's opinion that Garcini's testimony was proper. I would affirm the trial court on all issues.