# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *McGee v. City of Chicago*, 2012 IL App (1st) 111084

---

| | |
|---|---|
| Appellate Court Caption | DONNY McGEE, Plaintiff-Appellee, v. THE CITY OF CHICAGO; ERNA QUINN, Special Representative for the Estate of Edward Farley; ROBERT LENIHAN; and ROBERT BARTIK, Defendants-Appellants. |
| District & No. | First District, Second Division<br>Docket No. 1-11-1084 |
| Filed | October 9, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The judgment for plaintiff in his action against a city and some of its police officers for malicious prosecution was reversed and the cause was remanded for a new trial based on the trial court's abuse of discretion in refusing to *voir dire* the jurors after learning that the Internet research conducted by one juror on the issue of memory lapses, an issue in the case, had reached the jury. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-L-3503; the Hon. Susan Ruscitti-Grussel, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Stephen R. Patton, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Kerrie Maloney Laytin, Assistant Corporation Counsel, of counsel), for appellants.

Loevy & Loevy, of Chicago (Arthur Loevy, Jon Loevy, Russell Ainsworth, and Roshna Bala Keen, of counsel), for appellee.

Panel

PRESIDING JUSTICE HARRIS delivered the judgment of the court, with opinion.

Justices Murphy* and Connors concurred in the judgment and opinion.

## OPINION

¶ 1    Here we are called upon to determine whether defendants are entitled to a new trial where the circuit court failed to remove or even *voir dire* a juror who had performed Internet research on an issue in the case.[1] We decide the answer is yes.

¶ 2    Plaintiff, Donny McGee, brought claims of malicious prosecution and intentional infliction of emotional distress against defendants the City of Chicago; Erna Quinn, as special representative for the estate of Chicago police detective Edward Farley; Chicago police detective Robert Lenihan; and Chicago police officer Robert Bartik.[2] After a trial, a jury found for plaintiff on his malicious prosecution claim and for defendants on the intentional infliction of emotional distress claim.

¶ 3                    JURISDICTION

¶ 4    On June 8, 2010, the jury returned its verdict, and the circuit court entered judgment on that verdict. On March 9, 2011, the circuit court denied defendants' motion for a new trial or remittitur. On April 6, 2011, defendants timely filed their notice of appeal. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rules 301 and 303 governing appeals from final judgments entered below. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. May 30, 2008).

---

*Justice Michael Murphy reviewed the briefs, reviewed and signed the opinion and participated in oral argument prior to his death.

[1]Due to the disposition of this appeal, we need not consider defendants' other arguments.

[2]Before this court, all of the defendants are represented by the corporation counsel of the City of Chicago, and we will refer to them collectively as defendants. However, we will refer to the defendants individually by name when referring to their respective testimony or when referenced by plaintiff's testimony.

¶ 5                                    BACKGROUND

¶ 6          In his complaint, plaintiff alleged that defendants prosecuted him for the murder of his elderly next door neighbor based on a fabricated confession. Plaintiff was acquitted but due to the fabricated confession, he spent three years wrongfully incarcerated awaiting trial. Plaintiff's civil complaint contained claims of malicious prosecution and intentional infliction of emotional distress against defendants. After a trial, a jury returned a verdict in favor of plaintiff on his malicious prosecution claim and in favor of defendants on the intentional infliction of emotional distress claim. The jury awarded compensatory damages in the amount of $975,000 against defendants, and punitive damages of $110,000 against each individual defendant.

¶ 7          Below, we will only recite the facts necessary for the disposition of this appeal. Namely, we will recite the facts surrounding plaintiff's testimony of having memory lapses, and the circuit court's rulings upon learning that a juror had made an Internet search on memory lapses and, during the trial, brought outside information into the jury room.


¶ 8                                    Memory Lapses

¶ 9          Defendants' counsel first introduced the issue of memory lapses during his opening argument. Defendants' counsel, while discussing what Detective Lenihan would testify to at trial, stated:

          "So [Detective Lenihan] says, Donny [the plaintiff], your prints match Item Evidence No. 7. He says it matches No. 7. What do you got to say about that? And Donny gives kind of a vague answer. He's like, I didn't do this. I couldn't have done this. But, you know, I got hit in the head in Mexico and I blackout sometimes.

          Well, [plaintiff] will admit he did get hit in the head in Mexico. He got hit in the head in Mexico. So he says–he kind of denies it, but then he says, Oh, I got hit in the head in Mexico and I have blackouts. So they said, will you take a polygraph? And he agrees."

¶ 10         Plaintiff's sister, Mireya Oleszkiewicz, was asked about her brother's memory lapses during cross-examination. When asked whether her brother ever discussed with her that he had blackouts or memory losses, she answered, "no."

¶ 11         Plaintiff, during cross-examination, admitted that he was hit in the head with a bottle while in Mexico, but he denied telling that to the detectives. He also denied telling the detectives "anything about memory lapses," but admitted that "[i]n certain situations" he did tell other people about having memory lapses. The following exchange then occurred between plaintiff and defendants' counsel:

          "Q. Isn't it true you had experienced memory lapses?

          A. That is not true.

          Q. You deny never having memory lapses?

          A. I don't think–memory lapses like–I mean, some people have memory lapses but–

          Q. Well, you did say you had told other people you had memory lapses, right?

A. Yes.

Q. But you're saying it actually isn't true?

A. All I can remember is one time my sister-in-law said I came out of my bedroom with my fiancé at that time in the buff, and I don't remember that happening. Is that a memory lapse? I don't know.

Q. Don't you remember at your criminal trial there was testimony at some point before the trial began in motions about you having blackouts and memory lapses?

A. I don't really remember that.

Q. Well, let me see if I can refresh your recollection. Don't you remember as a result of some testimony that was presented to the criminal court about memory lapses and blackouts weren't you sent for a mental health exam to see if you were fit to stand trial?

A. I remember being sent to sit–to go see if I was fit for trial, but I didn't know it had to do with alleged memory lapses. I thought they do that for every inmate to see if you're fit for trial.

Q. You just thought you were having a mental health exam because that was a routine procedure?

A. Yes.

Q. You don't recall there being anything about your mental health exam before your criminal trial that had anything to do with memory lapses?

A. No. I really don't remember that.

Q. Is that something that would be better answered by Sam Adams, Senior or Junior?

A. More than likely.

***

Q. So the memory lapses part you deny telling the detectives?

A. Yes, I deny.

Q. You agree you have said it to other people?

A. Yes, I have.

Q. But you deny it's actually true?

A. Yes."

¶ 12    Sam Adams, Sr.,[3] later testified that he remembered plaintiff "having problems with what he called blackouts or something of that nature." He testified further that because plaintiff was facing the death penalty and because of the blackouts, plaintiff's competency to stand trial was tested.

¶ 13    Detective Farley testified that he and Detective Lenihan questioned plaintiff regarding the murder. Specifically, they questioned plaintiff concerning the last time he was at the victim's house. Farley testified as follows:

---

[3]Sam Adams, Sr., along with Sam Adams, Jr., represented plaintiff during his criminal trial.

A. *** He then kind of stopped and said. Well, I don't think I could have hurt her but if I did–you know, I have these blackouts.

Q. And what else did he say? Did he say about why he had blackouts?

A. Well, then he went on to say that when he was in Mexico that he had been in a fight–I'm sorry. He didn't say that. He said, when I was in Mexico I got hit in the head with a bottle and ever since then I've had blackouts.

***

Q. *** What happens next in that room?

A. I confronted him and said, listen, you know, it's very convenient for you to come out now all of a sudden and have these blackouts."

¶ 14　　Detective Lenihan also testified regarding the above incident. Detective Lenihan testified that he and Detective Farley asked plaintiff whether he had killed the victim. Detective Lenihan testified that plaintiff's "response was really interesting. It was, I don't think I could have done it. I couldn't have. But if I did, I have these blackouts. I don't remember. When I was in Mexico, I was hit in the head with a beer bottle. And, again, he said, I don't think I could have done it. But if I did, if I hurt her, I don't remember." Detective Lenihan testified that he took notes during his interview with plaintiff, which are contained in his general progress report. When shown the general progress report, Detective Lenihan testified that it reflected plaintiff's statements about memory lapses.

¶ 15　　　　　　　　　　　Jury's Exposure to Outside Information

¶ 16　　During the *voir dire* of jury selection, the circuit court admonished the venire according to general cautionary instruction No. 1.01 of the Illinois Pattern Jury Instructions, Civil (Illinois Pattern Jury Instructions, Civil, No. 1.01 (2010)), as follows:

"The use of cell phones, text messages, internet postings, and internet access devices in connection with your duty violates the rules of evidence. And you are prohibited from using them. You should not do any independent investigation or research on any subject relating to the case.

What you may have seen or heard outside the courtroom is not evidence. This includes any press, radio, or TV programs. And it also includes any information available on the internet. Such programs that report that information are not evidence and your verdict must not be influenced in any way by such material."

¶ 17　　During the trial, the court bailiff informed the court that a juror had performed her own research on the Internet and had brought that information into the jury room. The court had the bailiff speak on the record regarding information that he had received. The bailiff, on the record, stated, "I have information by one juror that another juror went on the internet and she researched memory lapses, and apparently she has the information with her." The bailiff did not know which juror had the outside information, but that juror Regan Willis informed him of this information. The following exchange then took place between the court, counsel for the parties, and the bailiff:

" MR. HALE [defendants' attorney]: Well, your honor, this is definitely a troubling

-5-

issue because they were instructed not to do this, and I have a lot of reservations about it ***.

THE COURT: This is what the court plans to do. *** This particular juror walks before the court at this point solely with whatever information that juror has with them today regarding this, and then we can do voir dire. Any other thoughts?

MR. AINSWORTH: I think it sounds appropriate.

THE COURT: [Speaking to the court bailiff] So lets do this. You're going to be very tactful. Inquire who this person is, and I guess the best way to do it–thus, the fact of the matter is that what you just told us regarding this information I need to speak with the person who has secured that information and ask them to come out of the jury room. Do not say anything about breaking rules. I'm telling you that. Be as tactful as you can without intimidating anyone. Again, I want all the other jurors to feel pretty relaxed about this case. They don't know anything about it.

MR. AINSWORTH: I have no objection to proceeding in that regard.

THE COURT: Do you have any questions regarding that?

THE BAILIFF: No.

THE COURT: Defense counsel has any objection?

MR. HALE: I think your recommendation sounds fine. Let's take it one step at a time."

Later, the bailiff returned and stated to the court "No one owns up to it." The following exchange then occurred:

"THE COURT: I guess the only other thing we can do now is Mr. Reagan [*sic*] Willis to come out. It's going to be highlighted, a juror. Maybe we will be better if I reread this instruction in terms of the internet what I first admonished.

MR. HALE: Yeah

THE COURT: If you single him out, it's going to *** become problematic.

You have to be very delicate, to say the least."

Whereupon, the court put aside its consideration of having juror Regan Willis "come out" for *voir dire* and proceeded to reread to the jury the same instructions first admonished to the entire venire.

¶ 18    On the next court date, defendants' counsel requested that the court *voir dire* juror Regan Willis regarding his fellow juror's independent research. The following exchange then occurred between the court, parties' counsel, and the bailiff.

"MR. HALE [defendants' attorney]: *** The issue I wanted to raise is the juror issue. *** [W]e thought about it over the weekend, the issue with the juror.

***

I have two concerns after having thought about it all weekend and discussed it with my clients: One, that a juror did do obviously some sort of independent research; two, that juror brought whatever they had to court into the jury room; and three, that juror did not disclose the fact that they had done that.

-6-

So what the defense would request *** is bring Mr. Willis out. We ask him who was the juror that had the material. Once that jurors identified, we bring that juror out. We ask them, you know, did you have an article about memory lapses?

***

And we flush it out and then we decide where we go from there because we think *** it's a pretty serious issue, and I think that would be–that's–we request that the court do that.

THE COURT: Response, please.

MR. AINSWORTH [plaintiff's attorney]: I don't feel strongly about the issue, but I do feel that there hasn't been proof that somebody was actually doing outside research. We just know that that article was observed by Mr. Willis. We have no reason to doubt his account.

But we don't know that somebody was actually doing that in relation to this case. We don't know whether somebody was–just happened to have that item in their possession related to this case.

We don't know. We could find out. I think that it would highlight the issue to bring him and create some tension to bring Mr. Willis out.

At the same time, judge, I don't feel super strongly about the issue. If the court is inclined to do so, I'm not going to stand up and object, but I think the only reason that I'm taking a contrary position is because I think the Court's instruction directing them not to look at things outside of the evidence in this case solved whatever the issue may have been.

***

MR. HALE: I mean, its no coincidence that the juror had a memory lapse document within the case because memory lapse, as we all know it, has been about a big part of the trial and the testimony.

So clearly the juror, it sounds like he had something and brought it into court. Now, whether they got it from the internet or whether they got it somewhere else I don't think really matters.

The point is they brought–it sounds like, according to Mr. Willis, they brought some article into the jury room. So I just wanted to clear that up.

THE COURT: Eric [the bailiff], last week you advised the court that Mr. Willis had advised you regarding a document having to do with memory lapses.

Do you recall if there was any further statement by him regarding the title or the content of this document?

THE BAILIFF: Other than it had to do with memory lapse. When I went in the second time, they kind of identified who it was but that person wouldn't own up to it.

THE COURT: Okay. When you say they kind of identified, can you tell me who was the person who was identifying who?

THE BAILIFF: Actually it wasn't just him. It was a couple of other jurors too.

THE COURT: Okay. Can you tell me the others?

THE BAILIFF: Yes, they know who brought it.

THE COURT: Can you tell me who the other jurors were who identified someone?

THE BAILIFF: I believe Davis.

THE COURT: Mr. Davis, Charlie Davis.

THE BAILIFF: Yeah, and I think a couple of others. I'm not sure of exactly who else.

THE COURT: Who was the person that they–

THE BAILIFF: They are saying it was Freeman, Freeman, but I didn't even ask no one.

THE COURT: Now, did either Charlie Davis or did Reagan [*sic*] Willis tell you anything in regards to the title of this document or the actual contents?

THE BAILIFF: Mr. Willis told me. I don't know how detailed they were able to read the information she had, but he said it had to do with memory lapses.

THE COURT: Like what in particular regarding memory lapses?

THE BAILIFF: He didn't get into that.

THE COURT: He didn't know the subject matter?

THE BAILIFF: No."

The court characterized the question before it as whether the information that reached the jury pertained to the case or not. Defendants' counsel argued that the issue of memory lapse was related to the case as shown by the testimony addressing the issue. Specifically, defendants' counsel argued that "[m]emory lapses is a very specific type of article and it's a very specific issue in this case, and so it just seems to me like it has to be something that was brought and gathered because of the testimony that was heard in this case." Defendants' counsel stated that he feared the juror did not follow the court's instructions regarding outside research, that the juror brought the alleged document into court, shared the document, and did not admit to bringing it into court when asked by the bailiff. Accordingly, he argued that if this is true about juror Freeman, then she should be removed. In response, plaintiff's attorney stressed "we don't know whether or not this–article relates to the case." He stated further "it hasn't been a big issue in the case but it has been an issue in the case." The court then asked the parties to submit a memorandum of law on the issue for the next court date.

¶ 19 The next court date, a hearing on defendants' motion resumed. Defendants' counsel argued that memory lapse was an issue in the case, evidenced by plaintiff's offering of Detective Farley's and Detective Lenihan's testimony. Defendants' counsel pointed out that it is unknown what effect the information had on juror Freeman and that "the court should flush the issue out through a voir dire." Counsel also argued that it is unknown which other jurors Freeman shared the information.

¶ 20 In response, plaintiff's counsel argued that bringing in Freeman for questioning may impact her deliberation and may cause problems with her fellow jurors. Additionally, plaintiff's counsel warned that "the more you talk about memory lapse to Ms. Freeman, then the more it becomes an issue with her, and then you're injecting additional facts that she now

knows that the rest of the jury doesn't know." Plaintiff's counsel maintained that the court's repeated admonishment was a curative instruction and the appropriate course of action to take.

¶ 21   The court decided that it is presumed jurors follow instructions and that the court is hesitant to *voir dire* a juror because "[t]he court surely doesn't want to embarrass any juror, or make that juror feel that somehow or another that juror has done something wrong." The court concluded that *voir dire* of Ms. Freeman or any other juror was not necessary.

¶ 22   After trial, defendants filed a motion for a new trial, and relevant to this appeal, argued that the circuit court abused its discretion by failing to remove or even *voir dire* the juror who performed independent research on the issue of memory lapse. The circuit court denied defendants' motion for a new trial. Defendants timely filed their notice of appeal.

¶ 23                                    ANALYSIS

¶ 24   Defendants argue that a new trial is required due to the circuit court's failure to remove or *voir dire* the juror who conducted her own Internet research on memory lapses. Defendants allege that the juror in question brought the Internet research into the jury room, where at least two other jurors saw it. Due to the conflicting nature of the testimony, which called for the jury to make a credibility assessment, defendant maintains that plaintiff's memory lapse was a crucial issue in the case. According to defendants, it is unknown what effect the article had on the other jurors due to the circuit court's refusal to *voir dire* the juror. Defendants contend we should not give the circuit court's decision any deference "in light of that court's failure to even gather the facts that were necessary for the proper exercise of its discretion."

¶ 25   In response, plaintiff argues that the abuse of discretion standard is the appropriate standard of review this court should follow, and that the circuit court acted within its sound discretion in allowing the juror in question to remain empaneled. Plaintiff also maintains that defendants waived their right to challenge the circuit court's decision because the defendants allegedly ratified the circuit court's plan to issue a curative instruction to the jury. Plaintiff argues *voir dire* of the juror "carried the risk of compounding the problem rather than ameliorating it." Plaintiff disputes that memory lapses were a crucial issue to the case and argues that defendants cannot show prejudice because this was not a close case.

¶ 26   In reply, defendants argue the circuit court's failure to question the juror who brought in her own research showed disregard for the presumption that extrinsic evidence viewed by the jury is prejudicial. Although defendants maintain that this court owes the circuit court no deference on this issue, they argue that a new trial is required even under the abuse of discretion standard due to the circuit court's failure to even ascertain the content of the research brought in by the juror. Defendants dispute that they waived this issue on appeal, arguing that the record shows they properly preserved the issue for appeal by objecting at trial, the objection of which was fully briefed by the parties at trial, and by objecting in a posttrial motion. Defendants argue that the circuit court did not treat the issue as waived, as shown by its ordering the parties to brief the issue and then ruling on the merits of the issue.

¶ 27   Initially, we hold that defendants did not waive this issue on appeal because the circuit

court ruled on the merits of the issue both during the trial and in denying defendants' posttrial motion. See *Truchon v. City of Streator*, 70 Ill. App. 3d 89, 94 (1979) (party waived objection to any procedural insufficiency where the issue was argued and decided on the merits in the circuit court); *Watseka First National Bank v. Ruda*, 135 Ill. 2d 140, 146-47 (1990) (where a defense was first raised during a defendant's opening statement, our supreme court stated "[a]ny procedural error that might have arisen from this method of raising the issue is inconsequential, however, because no objection appears in the record, counsel later argued the merits of the defense and the judge ruled on it").

¶ 28    Evidence of a jury's motives, methods, or its decision-making process is typically inadmissible to impeach a verdict. *People v. Collins*, 351 Ill. App. 3d 175, 179 (2004). However, where extraneous or unauthorized information has reached the jury, evidence of such events can be used to impeach a verdict. *Id.* If extraneous or unauthorized information has reached the jury, it is presumed prejudicial. *Thornton v. Garcini*, 364 Ill. App. 3d 612, 616-17 (2006). "The party challenging the verdict needs to show only that the information relates directly to something at issue in the case which the losing party did not have the opportunity to refute and that may have influenced the verdict." *Id*. at 617. If this is shown, the burden shifts to the nonmovant to show that no prejudice occurred. *Stallings v. Black & Decker (U.S.), Inc.*, 342 Ill. App. 3d 676, 681 (2003). "A verdict may stand only if it is 'obvious' that no prejudice accrued to the defendant." *Collins*, 351 Ill. App. 3d at 179-80 (quoting *People v. Hobley*, 182 Ill. 2d 404, 462 (1998)). "The determination of whether prejudice has occurred rests in the sound judicial discretion of the court after it has considered all the facts and circumstances." *Thornton*, 364 Ill. App. 3d at 617.

¶ 29    In this case, we hold the circuit court abused its discretion by failing to *voir dire* the juror who performed extraneous research on an issue that had a direct bearing on the case, *i.e.*, plaintiff's alleged memory lapses. Defendants, as the parties challenging the verdict, were required to show that the extraneous information directly related to an issue in the case that they were not able to refute and that the information may have had an influence on the verdict. See *Thornton*, 364 Ill. App. 3d at 617 ("[t]he party challenging the verdict needs to show only that the information relates directly to something at issue in the case which the losing party did not have the opportunity to refute and that may have influenced the verdict").

¶ 30    Plaintiff's complaint alleged defendants committed malicious prosecution and the intentional infliction of emotional distress due to the fabrication of a confession. Defendants initially brought plaintiff's alleged memory lapses to the jury's attention during opening arguments. Plaintiff denied telling Detectives Farley and Lenihan that he experienced memory lapses, and denied that he actually experienced memory lapses, but admitted that he had told other people that he has had memory lapses. He also testified that he was hit in the head by a bottle while in Mexico. Both Detectives Farley and Lenihan testified regarding plaintiff's statement to them that he did experience memory lapses and that he started to experience memory lapses after he was hit in the head by a bottle while in Mexico. Plaintiff's criminal trial attorney recalled plaintiff "having problems with what he called blackouts."

¶ 31    The plaintiff's alleged memory lapses bear directly on both his and defendants' credibility. The jury's consideration of plaintiff's claimed memory lapses was critical to the outcome of the case. Because the court did not *voir dire* the informing and offending jurors,

defendants were never able to refute whatever was in the extraneous information concerning memory lapses. It is reasonable to conclude that the information likely affected the verdict, as shown by the juror's eagerness to perform independent research on the issue and share the information within the jury room. Accordingly, we hold that defendants have shown that plaintiff's alleged memory lapses directly related to an issue at trial, that they were not able to refute the extraneous information, and that it may have influenced the verdict.

¶ 32    The burden then shifted to plaintiff, as the nonmovant, to show that no prejudice occurred. *Stallings*, 342 Ill. App. 3d at 681; see also *Collins*, 351 Ill. App. 3d at 179-80 ("A verdict may stand only if it is 'obvious' that no prejudice accrued to the defendant." (quoting *Hobley*, 182 Ill. 2d at 462)). We hold that plaintiff has not satisfied this burden.

¶ 33    The circuit court abused its discretion in denying defendants' request to *voir dire* the jurors. Once it became apparent that extraneous information on memory lapse had reached the jury, the circuit court's well-intentioned concern not to embarrass any juror was misplaced. The circuit court should have sustained defendants' request to *voir dire* the juror in chambers. At a minimum, the circuit court should have determined what was brought into the jury room, what it contained, and who had read it. The court could then determine whether the extraneous information was prejudicial. Unfortunately, this did not occur and plaintiff has not overcome the presumption that the extraneous information was prejudicial. *Thornton*, 364 Ill. App. 3d at 616-17. Accordingly, we reverse the judgment of the circuit court and remand the matter for a new trial.

¶ 34                                    CONCLUSION

¶ 35    The judgment of the circuit court is reversed and the cause is remanded.

¶ 36    Reversed and remanded.